UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 7 |
| OXFORD STREET EDUCATION, LLC., | ) | |
| d/b/a THE CROFT SCHOOL, | ) | Case No. 26-11334-JEB |
| | ) | |
| Debtor. | ) | |
| | ) | |

**LIMITED OBJECTION OF 179 WAYLAND AVENUE, LLC TO TRUSTEE'S MOTION
FOR AUTHORITY TO REJECT THE LEASE OF NONRESIDENTIAL REAL
PROPERTY
(129 WAYLAND AVENUE)**

NOW COMES, 179 Wayland Ave, LLC (the "Landlord" or the "Objector'), by and through undersigned counsel, and hereby submits this limited objection to the Trustee's Motion for Authority to Reject the Lease of Non-Residential Real Property [located at] 179 Wayland Avenue (the "Motion").

**BACKGROUND**

1. Landlord and Oxford Street Education, LLC d/b/a the Croft School (the "Debtor") maintain an unexpired, non-residential real property lease agreement for the premises located at 179 Wayland Ave, Providence, Rhode Island 02906 (the "Lease").

2. On June 5, 2026 (the "Petition Date") Debtor filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code'). The Debtor continued to operate its business, post-petition until at least June 12, 2026.

3. On June 23, 2026, Debtor's Trustee, Harold B. Murphy, ("Trustee") by and through counsel filed the Motion. *See* Dkt. No. 30. In the Motion, Trustee seeks authorization to reject the Lease.

4. The Trustee has further requested that the relief with respect to the Lease be granted with a retroactive effective date of the Petition Date (the "Proposed Retroactive Effective Date"). *See id*.

5. As of the date of this filing, Debtor continues to occupy the Premises and maintains personal property at the Premises. See Declaration of Steven R. Lewinstein attached hereto as **Exhibit A**.

6. Landlord does not and has not had access to the Premises due to Debtors continued occupancy.

**LIMITED OBJECTION AND RESERVATION OF RIGHTS**

Objector, as landlord under the Lease, hereby objects to Trustee's request that the rejection of the Lease be effective as of the Proposed Retroactive Effective Date. Landlord respectfully asserts that the effective date of the rejection of the Lease should be no earlier than the later of either (1) date on which this Court entered an order granting the Motion, or (2) as of the date Landlord obtains full control over the Premises. Landlord reserves all of its rights with respect to the rejection of the Lease, its rights to object to any other relief sought by the Debtor in connection with the rejection of the Lease, and its rights to take any action to protect Landlord's position, including, without limitation, filing an administrative claim.

**A. Retroactive Rejection Of An Unexpired Non-Residential Real Property Lease Should Only Be Granted Under Limited Circumstances**

7. A debtor's decision to assume or reject an unexpired lease is "subject to the court's approval." 11 U.S.C. § 365(a). Accordingly, a debtor's rejection of a nonresidential lease does not become legally effective merely upon the debtor's filing of a motion to reject; rather, rejection becomes effective only after judicial approval has been obtained. *Thinking Machine Corp. v. Mellon Fin. Servs. Corp. #1 (In re Thinking Machines Corp.)*, 67 F.3d 1021, 1028 (1st Cir. 1995); see also *In re Fleming Companies, Inc.*, 304 B.R. 85, 96 (Bankr.

D. Del. 2003) (recognizing that "court approval is a precondition to a debtor's rejection of a lease" under the plain language of § 365(a)).

8. The effective date of a rejection is the date the Order is entered. *See In re National Record Mart, Inc.*, 272 B.R. 131, 133 (Bankr.W.D.Pa.2002) (agreeing with the general principle that the effective date of a debtor's rejection of an unexpired lease is the date the court enters the order); *In re Appliance Store, Inc.*, 148 B.R. 234, 240 (Bankr.W.D.Pa.1992) (finding that the plain unequivocal language of section 365 states that court approval is a precondition to a debtor's rejection of a lease). *See also In re Amber's Stores, Inc.*, 193 B.R. 819, 825–26 (Bankr.N.D.Tex.1996) (noting that the majority of courts have found that the effective date of rejection is the date of the entry of the bankruptcy court's order approving rejection).

9. A Court may order rejection retroactive to an earlier date "to avoid penalizing the debtor for an unnecessary delay caused by the creditor" *See In re Jamesway Corp.,* 179 B.R. 33, 39 (S.D.N.Y.1995) or if there would be no prejudice to [the creditor]. *See In re Garfinckels, Inc.*, 118 B.R. 154 (Bankr.D.D.C.1990).

**B. A Retroactive Effective Date Is Not Appropriate Under The Present Circumstances**

10. Landlord respectfully asserts that a balancing of the equities does not support Trustee's attempt to retroactively reject the Lease.

11. In its Motion, the Trustee has asserted that the "Debtor has terminated operations, and the Estate has no use for the Lease. This assertion is not correct. Although Debtor has ceased teaching at the Premises, they are still benefitting from the Lease by using the Premises as a personal storage unit, to house its personal property.

12. Landlord is unable to release the Premises due to Debtor continuing to store its personal property at the Premises, and until July 13th, 2026 when counsel received Notice of Abandonment of Estate's Interest in Personal Property (Providence, Rhode Island) (the "Notice of Abandonment"), Landlord believed Debtor was going to remove its personal property.

13. No limited exception to retroactively approve the rejection of the Lease applies here, as Debtor unnecessarily delayed conveyance of the Premises to Landlord through its continuous use of the Premises and delayed Notice of Abandonment.

14. The Court has discretion to allow the rejection the Lease as of the date Landlord fully obtains possession over the Premises. Due to Debtor actively using the Premises as a storage unit, Landlord does not have full possession over the Premises.

15. In the alternative, the Court has discretion to allow the rejection of the Lease as of the hearing date. In this event, although Landlord still experiences a shortfall due to Debtor's actions, in the balance of the equities, Landlord may still recoup some payment for Debtor's use of the Premises.

**<u>CONCLUSION</u>**

For the foregoing reasons, Landlord respectfully requests that any relief granted with respect to the rejection of the Lease be effective as of the date Landlord obtains full control over the Premises or an order is entered by this Court approving rejection of the Lease, and (b) that the Court grant such other and further relief as is just and proper.

Respectfully submitted,

179 Wayland Avenue, LLC

Through its counsel,

/s/  Hannah J. Schilling
Richard J. Land (662166)
Hannah J. Schilling (715702)
Chace Ruttenberg & Freedman, LLP
One Park Row, Suite 300
Providence, RI 02903
Telephone: (401) 453-6400
Email:  rland@crfllp.com
        hschilling@crfllp.com
Dated: July 14, 2026

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 7 |
| OXFORD STREET EDUCATION, LLC., | ) | |
| d/b/a THE CROFT SCHOOL, | ) | Case No. 26-11334-JEB |
| Debtor. | ) | |
| | ) | |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 15th day of July, 2026, he caused copies of the Limited Objection of 179 Wayland Avenue, LLC to be served electronically through this Courts CM/ECF System, upon the following parties:

**SERVICE LIST**

- James G. Atchison: atchison@casneredwards.com; luo@casneredwards.com
- Jennifer V. Doran: jdoran@haslaw.com; calirm@hinckleyallen.com; kabarrett@hinckleyallen.com
- Richard King – B: USTPRegion01.BO.ECF@USDOJ.GOV
- John T. Morrier: morrier@casneredwards.com; luo@casneredwards.com
- Harold B. Murphy: mxc@hanify.com; ma33@ecfcbis.com; kflynn@murphyking.com
- Nina M. Parker: parker@mandkllp.com; alston@mandkllp.com; soares@mandkllp.com
- Hanna J. Redd: hanna.redd@troutman.com; monica.molitor@troutman.com

*/s/ Hannah J. Schilling*
Richard J. Land (662166)
Hannah J. Schilling (715702)
Chace Ruttenberg & Freedman, LLP
One Park Row, Suite 300
Providence, RI 02903
(401)865-6400
rland@crfllp.com
hschilling@crfllp.com

**EXHIBIT A**

<u>DECLARATION OF STEVEN R. LEWINSTEIN IN SUPPORT OF 179 WAYLAND
AVENUE, LLC'S LIMITED OBJECTION TO TRUSTEE'S DEBTORS' MOTION FOR
AUTHORIZATION TO REJECT THE LEASE OF NON-RESIDENTIAL REAL PROPERTY</u>

I, Steven R. Lewinstein, make this declaration pursuant to 28 U.S.C. § 1746 and state as follows:

1. I am the sole member of 179 Wayland Avenue, LLC ("Landlord"). I have served in this position since the inception of the entity in or around May 28, 1996.

2. I submit this declaration (the "Declaration") in support of 179 Wayland Avenue, LLC's Limited Objection to Trustees' Motion for Authorization to Reject the Lease of Non-Residential Real Property (179 Wayland Ave).

3. I am over 21 years of age, of sound mind, and competent to make this Declaration. If called as a witness, I could and would competently testify that the facts stated in this Declaration are true and correct based upon my personal knowledge and my review of business records maintained by Landlord. Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge of Landlord's business operations, my review of business records maintained in the ordinary course of business and other relevant documents, or my opinion based on my experience, knowledge, and information concerning Landlord's operations. The records I referred to in making this Declaration were made in the ordinary course of Landlord's business and it was a regular practice of Landlord's business to make such books and records. The books and records relied upon as referenced herein were made at or near the time of the activity described herein or were made from information transmitted by someone with knowledge. It is a regularly conducted business activity of Landlord to keep such business records. I am authorized to submit this Declaration on behalf of Landlord.

4. On or about May 21, 2018, 179 Wayland Avenue, LLC as Landlord and Oxford Street Education, LLC d/b/a the Croft School (the "Croft School") as tenant, entered into that certain Lease (the "Original Lease"). Pursuant to the Original Lease, Landlord leased space (as more fully described in the Original Lease (defined below), the "Premises") to the Croft School in that certain building located at 179 Wayland Avenue, Providence Rhode Island 02906 (the "Building"). A true and correct copy of the Original Lease is attached hereto as Exhibit 1 and incorporated fully herein by reference.

5. The parties executed a lease option on October 25, 2020 to extend the existing lease by three additional years, through and including August 31, 2031, and subsequently executed one modification to the Original Lease representing this extension, which is dated November 18, 2023 (the "Modification," and together with the Original Lease, collectively hereinafter referred to as the "Lease"). A true and correct copy of the Modification is attached hereto as Exhibit 2 and incorporated fully herein by reference.

6. Rent for each month is due on the first of each month.

7. I have not received payment under the Lease since May 2026.

8. I understand that The Croft School seeks to reject the Lease and has asked that rejection be made retroactively effective as of June 23, 2026.

9. Landlord cannot release the Premises until all of the Personal Property is disposed of.

I declare under penalty of perjury that the foregoing statements are true and correct.

/s/ _Stephen R Lewinstein_
Steven R. Lewinstein
Dated: July 14, 2026

EXHIBIT 1

## LEASE AGREEMENT

This Lease Agreement (the "Lease") is entered into this _____ day of May, 2018 by and between Landlord (as defined in Section 1.1, together with its successors and assigns) and Tenant (as defined in Section 1.1, together with its successors and assigns).

## ARTICLE 1

## PRINCIPAL LEASE TERMS

Section 1.1. For convenience of the parties, certain basic provisions of this Lease are set forth herein. The provisions set forth herein are subject to the remaining terms and conditions of this Lease and are to be interpreted in light of such remaining terms and conditions.

Landlord:

179 Wayland Avenue, LLC
c/o Capstone Properties
5 Burlington Woods
Burlington, Massachusetts 01803

Tenant:

Oxford Street Education, LLC, d/b/a The Croft School

Address Before Commencement:

PO Box 2614
Providence, Rhode Island 02906

Address After Commencement

179 Wayland Avenue, Second Floor
Providence, Rhode Island 02906

Premises:

The entire leasable portion of the second floor (the "Premises") containing 7,400 rentable square feet of the building located at 179 Wayland Avenue, Providence, Rhode Island (the "Building"). The Premises are outlined on the Lease Plan attached hereto as Exhibit A.

Lease Commencement Date:

The date hereof

Base Rent Commencement Date:

The date on which Tenant commences any operations from the Premises or September 1, 2018, whichever occurs first

Initial Term:

From the Lease Commencement Date through August 31, 2021

Option to Renew:

One (1) for three (3) years

Permitted Use:

Operation of a private primary school and office uses ancillary to the operation thereof (the "School")

- 1 -

Base Rent:

| From | To | Annually | Monthly | Per Square Foot |
|---|---|---|---|---|
| The Base Rent Commencement Date | August 31, 2019 | $118,400.00 | $9,866.67 | $16.00 |
| September 1, 2019 | August 31, 2020 | $133,200.00 | $11,100.00 | $18.00 |
| September 1, 2020 | August 31, 2021 | $148,000.00 | $12,333.33 | $20.00 |
| September 1, 2021 | August 31, 2022 | $155,400.00 | $12,950.00 | $21.00 |
| September 1, 2022 | August 31, 2023 | $162,800.00 | $13,566.67 | $22.00 |
| September 1, 2023 | August 31, 2024 | $177,600.00 | $14,800.00 | $24.00 |

Security Deposit: $118,400.00, subject to reduction as follows provided no Event of Default exists on the date of the reduction in question:

| Date of Reduction | Amount of Reduction |
|---|---|
| June 30, 2019 | $29,600.00 |
| June 30, 2020 | $29,600.00 |
| June 30, 2021 | $29,600.00 |

At Landlord's option, upon written notice to Tenant, Landlord shall either pay the Amount of Reduction to Tenant by check on the Date of Reduction or Landlord shall credit the Amount of Reduction to subsequent payments of monthly Base Rent falling due under this Lease.

Proportionate Share: 50%

## ARTICLE 2

## PREMISES AND USE

Section 2.1. Premises. (a) Subject to the terms and conditions contained in this Lease, Landlord hereby leases the Premises to Tenant for the Permitted Use and Tenant hereby leases the Premises from Landlord for the Permitted Use. The Premises shall be deemed to contain 7,400 rentable square feet irrespective of the actual rentable square footage ("RSF").

(b) In addition to the Premises and for no additional consideration other than that stated in this Lease, Landlord hereby grants to Tenant the exclusive right, for the sole benefit of its employees, students and invitees, to use the first floor lobby and elevator and staircase serving the Premises. Additionally, Tenant shall have, as appurtenant to the Premises, the non-exclusive right in common with others lawfully entitled thereto, to use the sidewalks adjacent to the Building as the same shall exist or be modified or reconstituted by Landlord from time to time for ingress to and egress from the Premises.

Section 2.2. Student Drop Off and Pick Up Requirements. Tenant shall be subject to and shall notify all families and other persons participating in the drop off and pick up of students of the following requirements:

(a) Each student shall be escorted on foot to the Premises by an adult at the beginning of the school day and shall be greeted at the Premises by an adult when leaving the Premises at the end of the school day.

(b) For the avoidance of doubt, drop off and pick up shall take place inside the Premises, not in the stairwell or lobby of the Building or outside of the Building

(c) No adult picking up a student at the end of a school day shall park or "double park", with or without flashers on on Wayland Avenue.

(d) Beginning after the second month of full school operations by Tenant and continuing to the day before the first anniversary of the Base Rent Commencement Date, adults dropping off a student at the beginning of the school day may use available metered parking spaces on Wayland Avenue; provided, however, Tenant shall prohibit adults dropping off students at the beginning of the school day from parking on Wayland Avenue if Landlord notifies Tenant that, in Landlord's opinion, the parking practice has created disruption to Wayland Square businesses or traffic congestion in Wayland Square. In addition, Tenant shall strictly enforce the limitation that no adult dropping off a student at the beginning of the school day may "double park" with or without flashers on Wayland Avenue.

(e) Beginning on the first anniversary of the Base Rent Commencement Date and continuing until the expiration of the Initial Term, Tenant, at its expense, shall have a "chaperone" or "concierge" located at the exterior front entrance to the Premises from 7:30 am to 8:30 am on each school day to accompany students to the interior of the Premises. Adults dropping off a student at the beginning of the school day may use available metered parking spaces on Wayland Avenue; provided, however, Tenant shall strictly enforce the limitation that Wayland Avenue parking spaces may be used for no more than three (3) minutes per drop off and that no adult dropping off a student at the beginning of the school day may "double park" with or without flashers on Wayland Avenue.

(f) During the Renewal Term, as defined in Section 3.2(a), the student drop off and pick up requirements shall be as agreed upon by the parties; provided, however, in the event the parties have not executed a writing memorializing the same prior to the date Tenant delivers the Exercise Notice, as defined in Section 3.2(a) to Landlord, the Exercise Notice shall be null and void and this Lease shall expire at the expiration of the Initial Term.

Section 2.3. Condition. Tenant acknowledges that it has had the opportunity to inspect the Premises and accepts the Premises in its present "AS IS" condition. Tenant acknowledges that Landlord, its agents and employees and other persons acting on behalf of Landlord, have

made no representation or warranty of any kind in connection with any matter relating to the physical or environmental condition, value, fitness, use or zoning of the Premises upon which Tenant has relied directly or indirectly for any purpose. Notwithstanding the foregoing, Landlord represents that utilities, including gas, electric, potable water and sewer are available to the interior of the Premises. Further notwithstanding anything to the contrary contained in this Lease, in the event that, after commercially reasonable efforts, Tenant does not receive all permits, licenses and approvals required by applicable laws, rules and regulations to operate the Premises for their Permitted Uses, Tenant may terminate this Lease upon written notice to Landlord, in which event Landlord agrees that Tenant's sole liability hereunder shall be to reimburse Landlord for up to $7,500.00 of Landlord's legal fees incurred in negotiating this Lease.

Section 2.4. Build-Out. (a) At its sole expense, Tenant shall perform all work necessary in order to prepare the Premises for the operation of Tenant's business ("Tenant's Work"). No portion of Tenant's Work shall result in any protrusions or penetrations into the ceiling in the West Elm space on the first floor of the Building.

(b) Tenant shall carry out Tenant's Work with contractors reasonably acceptable to Landlord and pursuant to plans and specifications approved by Landlord prior to the commencement of Tenant's Work (the "Plans") which approval shall not be unreasonably withheld, conditioned, or delayed. Landlord shall respond to Tenant's request(s) for Plans approval within five (5) business days after Landlord's receipt thereof. Any conditions or objections from Landlord shall be set forth with specificity in writing. Landlord's failure to respond within five (5) business days from its receipt of any request from Tenant for Plans approval shall be deemed approval. Landlord hereby acknowledges that Tenant's construction manager, Bowerman Associates is acceptable to Landlord. Landlord shall not charge Tenant for its cost of its review of the Plans. Tenant, at its sole risk, cost and expense, shall promptly commence and complete Tenant's Work in accordance with the Plans and in accordance with all applicable laws, codes and ordinances. Tenant shall cause its contractor or contractors to maintain liability insurance with limits reasonably required by Landlord. Tenant shall not amend or alter the Plans in any material respect without the prior written approval of Landlord. Tenant shall deliver to Landlord partial lien releases from all contractors, subcontractors and others providing labor and materials for Tenant's Work as such work progresses and shall deliver final lien releases (or otherwise bond over any mechanics' lien claims) within thirty (30) days of completion of Tenant's Work.

(c)     Tenant's Work shall include the installation of the sound and vibration control materials described on Exhibit B (the "Sound Control Work") at a cost to Tenant of Thirty-Two Thousand Nine Hundred Thirty One ($32,931.00) Dollars plus any applicable sales tax. On the later to occur of (i) the Base Rent Commencement Date and (ii) the receipt of a lien release from New England Soundproofing, Landlord shall reimburse Tenant for Ten Thousand ($10,000.00) Dollars of the cost of the Sound Control Work.

## ARTICLE 3

### TERM; RENT

Section 3.1. Term. This Lease is for the Term, beginning on the Lease Commencement Date.

Section 3.2. Option to Renew. (a) Subject to the right of Landlord set forth in Section 3.2(b), Tenant shall have an option to renew this Lease (the "Option") for one (1) additional term of three (3) years following the expiration of the Initial Term (such term being referred to as the "Renewal Term") upon the same terms and conditions as set forth herein with the exception of any further option to renew. In order to exercise the Option, Tenant shall so notify Landlord in writing (the "Exercise Notice") not less than nine (9) months prior to the expiration of the Initial Term. Upon commencement of the Renewal Term, all references in this Lease to the Term shall be considered references to the Renewal Term. Notwithstanding the foregoing, if an Event of Default exists either on the date of the Exercise Notice or on the commencement date of the Renewal Term, the Exercise Notice shall be null and voice and this Lease shall expire at the expiration of the Initial Term.

(b) Notwithstanding the foregoing, if Landlord notifies Tenant that Landlord, after the second month of full school operations by Tenant at the Premises (the first two months of full school operations referred to herein as the "Initial Probationary Period") or, from and after September of 2019, after the first week of school operations at the beginning of each academic year (the first week of school operations referred to herein as a "Subsequent Probationary Period"), has received one or more written complaints or other communications about noise emanating from the School, violations of the drop-off and pick up requirements set forth in Section 2.2, or traffic congestion in Wayland Square as a result of such violations, Landlord will provide Tenant with written notice of the complaint or other communication accompanied by a copy of each such complaint or communication (each, a "Landlord Notice"). Tenant shall be given thirty (30) days to remedy the condition described in each Landlord Notice to Landlord's satisfaction. In the event Landlord provides a Landlord Notice to Tenant three (3) times during the Term (excluding the Initial Probationary Period and any Subsequent Probationary Period) and thereafter receives an additional complaint, Landlord shall have the right to send a notice to Tenant terminating the Option to Renew ("Landlord Termination Notice"). Tenant shall have no right to remedy the condition described in the Landlord Termination Notice. In no event may Landlord send the Landlord Termination Notice less than ten (10) months prior to the commencement of the Renewal Term. When Tenant vacates and yields up the Premises at the expiration of the Initial Term in accordance with Section 5.6 after having received the Landlord Termination Notice, Landlord shall make a termination payment to Tenant in the amount of Thirty-Five Thousand ($35,000.00) Dollars.

Section 3.3. Base Rent. (a) Generally. Without notice or demand therefor, Tenant shall pay the Base Rent monthly, in advance, without set-off or counterclaim, beginning on the Base Rent Commencement Date and, thereafter, on the first day of each calendar month. Rent payable for any partial month shall be prorated on a daily basis.

(b) <u>The Term</u>. The annual Base Rent during the Term shall be as set forth in Article 1 of this Lease. Tenant shall pay the first installment of Base Rent on the Base Rent Commencement Date.

(c) <u>The Renewal Term</u>.  The annual Base Rent during the Renewal Term shall be as set forth in Article 1 of this Lease.

Section 3.4.  <u>Cure Rights</u>.  When a Tenant Event of Default, as hereinafter defined, exists, Landlord shall have the right, but shall not be obligated, and without waiving or releasing Tenant from any obligations of Tenant, after five (5) day's prior written notice, to make any such payment or to perform any such other act on behalf of Tenant in accordance with this Lease.  All sums so paid by Landlord and all necessary incidental costs shall be deemed additional rent hereunder and shall be payable by Tenant to Landlord on demand, together with interest at a rate equal to 1.5% per month on all such sums (such interest shall start accruing ten (10) days after the date of demand notice from Landlord to the date of repayment by Tenant). Landlord shall have, in addition to all other rights and remedies of Landlord, the same rights and remedies in the event of the nonpayment of such sums plus interest by Tenant as in the case of default by Tenant in the payment of Base Rent or Additional Rent.

Section 3.5.  <u>Late Payments.</u>  If any Base Rent or Additional Rent is not received by Landlord within ten (10) days of the date the same is due hereunder, Tenant shall incur a late charge equal to three percent (3%) of the amount due, and if not paid within five (5) days thereafter, shall bear interest from the date the same was due hereunder until paid at a rate equal to 1.5% per month.  In no event shall such late charge be deemed to grant tenant a grace period or extension of time within which to pay any rent or prevent Landlord from exercising any right or enforcing any remedy available to Landlord upon Tenant's failure to pay all rent due under this Lease in a timely fashion.

Section 3.6.  <u>Security Deposit</u>.  Upon signing this Lease, Tenant shall pay Landlord the amount of security deposit specified in Article 1 of the Lease (the "Security Deposit") which shall be subject to reduction in accordance therewith.  Said sum shall be held by Landlord, <u>without interest,</u> during the Term hereof and for so long thereafter as Tenant is in possession of the Premises or has unsatisfied obligations hereunder to Landlord, as security for the full and timely performance of the Tenant's obligations under the terms of this Lease.   In the event that Tenant defaults in respect of any of its obligations hereunder such that it is a Tenant Event of Default, Landlord shall have the right to apply from time to time the whole or any portion of the Security Deposit toward payment of any amount in default or in reduction of any damages Landlord might incur as a result of said Tenant Event of Default; and such use or application by Landlord shall be without prejudice of any other remedy Landlord may have under this Lease or otherwise at law or in equity.  If Landlord applies said Security Deposit or any portion thereof as aforesaid, Tenant shall, upon notice from Landlord, promptly replace the amount applied in order to restore said Security Deposit to its original amount.  Any portion of said Security Deposit, which has not been applied as aforesaid, shall be repaid by Landlord, without interest, to Tenant within thirty (30) days after the end of the Term, or as soon thereafter as all obligations of Tenant hereunder have been performed in full.

Section 3.7. Additional Rent on Account of Property Taxes. (a) Tenant, as additional rent, shall pay to Landlord its Proportionate Share of the real estate taxes and assessments assessed against the Building and billed to Landlord during the Term ("Property Taxes"). Landlord shall notify Tenant of the amount of such additional rent due hereunder and Tenant shall pay Landlord such amounts within thirty (30) days from the date it receives such notice. Landlord reserves the right to estimate Tenant's Proportionate Share of Property Taxes and require Tenant, together with monthly payments of Base Rent, to remit, as additional rent, an amount equal to one-twelfth (1/12) of the amount so estimated by Landlord. No later than one hundred twenty (120) days after the end of each Lease Year, Landlord shall furnish to Tenant a statement in reasonable detail setting forth the computation of Tenant's Proportionate Share of Property Taxes for the preceding year. If such statement shows that Tenant, during the preceding year, paid to Landlord more than its Proportionate Share of Property Taxes, Tenant's obligation to continue to make ongoing monthly payments on account of Property Taxes shall be suspended until Tenant receives credit for the full amount of any such overpayment. If such statement shows that Tenant, during the preceding year, paid to Landlord less than its Proportionate Share of Property Taxes, Tenant shall pay such deficiency to Landlord within thirty (30) days after its receipt of such statement.

(b) Tenant shall be responsible for the timely payment of any taxes or other assessments that are levied, assessed, charged or confirmed or imposed by any public or government authority upon, or measured by, or reasonably attributable to the cost or value of Tenant's equipment, furniture, fixtures and other personal property located at the Premises. In the event Landlord receives a bill for an assessment which Tenant is required to pay under this Section 3.7, Landlord shall promptly forward the same to Tenant.

(c) Nothing contained herein shall require Tenant to pay any franchise, corporate, estate, inheritance, succession, capital levy, or transfer tax of Landlord, any income, profits, or revenue tax, or any other tax, assessment, charge, or levy upon the rent payable by Tenant hereunder; provided, however, in the event, during the term of this Lease, the State of Rhode Island or any of its political subdivisions assesses a tax on rent against Landlord or the Base Rent, as a whole or partial substitution for or in addition to the current form of taxes or assessments assessed against the Premises, Tenant's Proportionate Share of such tax shall be included within the amount which Tenant shall be required to pay under this Section 3.7.

(d) The payment obligation of Tenant under this Section 3.7 is in the nature of additional rent (the "Additional Rent"), the nonpayment of which shall give rise to the same remedies available to Landlord in the event of nonpayment of Base Rent.

Section 3.8. Additional Rent on Account of Building Expenses. (a) Tenant, as Additional Rent, shall pay to Landlord its Proportionate Share of Building Expenses incurred by Landlord during the Term. For purposes of this Lease, Building Expenses shall refer to the expenses associated with exterior maintenance (including graffiti removal) (but not including replacements), snow removal, property, liability, flood, and other insurance premiums, fire protection equipment services and maintenance, exterminating services, operating licenses and permits, and management fees (capped at five (5%) percent of building rents). Notwithstanding

- 7 -

the foregoing, Tenant shall be solely responsible for any such costs if the need to incur the same was caused by the negligence of Tenant, its agents, employees, or invitees.

(b) Landlord may cause any or all of said services to be provided by an independent contractor or contractors.

(c) Landlord shall estimate Tenant's Proportionate Share of Common Area Charges each year and require Tenant, together with monthly payments of Base Rent, to remit, as Additional Rent, an amount equal to one-twelfth (1/12) of the amount so estimated by Landlord. No later than one hundred twenty (120) days after the end of each Lease Year, Landlord shall furnish to Tenant a statement in reasonable detail setting forth the computation of Tenant's Proportionate Share of Common Area Charges for the preceding year. If such statement shows that Tenant, during the preceding year, paid to Landlord more than its Proportionate Share of Common Area Charges, Tenant's obligation to continue to make ongoing monthly payments on account of Common Area Charges shall be suspended until Tenant receives credit for the full amount of any such overpayment. If such statement shows that Tenant, during the preceding year, paid to Landlord less than its Proportionate Share of Common Area Charges, Tenant shall pay such deficiency to Landlord within thirty (30) days after its receipt of such statement.

## ARTICLE 4

## INSURANCE AND INDEMNIFICATION

Section 4.1.  Landlord Indemnification.  Landlord shall indemnify and defend Tenant, its officers, managers, members, employees and agents (the "Tenant Indemnified Parties") with counsel acceptable to Tenant, against and hold the Tenant Indemnified Parties harmless from all claims, demands, liabilities, damages, losses, costs and expenses, including reasonable attorneys' fees and disbursements, arising from or related to the negligence or willful misconduct of Landlord.

Section 4.2.  Tenant Indemnification. Tenant shall indemnify and defend Landlord, its officers, managers, members, employees and agents (the "Landlord Indemnified Parties"), with counsel acceptable to Landlord, against and hold the Landlord Indemnified Parties harmless from all claims, demands, liabilities, damages, losses, costs and expenses, including reasonable attorneys' fees and disbursements, arising from or related to any use or occupancy of the Premises by Tenant, its agents, officers, employees, contractors, invitees, or licensees, or any default in the performance of Tenant's obligations, or any damage to any property (including property of employees and invitees of Tenant) or any bodily or personal injury, illness or death of any person (including employees and invitees of Tenant) occurring in or on the Premises or any part thereof arising at any time and from any cause whatsoever (except to the extent caused by the gross negligence or willful misconduct of the Landlord Indemnified Parties) or occurring outside the Premises when such damage, bodily or personal injury, illness or death is caused solely by the negligence or willful misconduct of Tenant or its agents, officers, employees, contractors, invitees or licensees.  Tenant shall also indemnify and defend the Landlord Indemnified Parties against and hold the Landlord Indemnified Parties harmless from all claims, demands, liabilities, damages, losses, costs and expenses, including reasonable attorneys' fees

and disbursements, arising from or related to incidents that would otherwise have been covered by an insurance policy that Tenant was obligated to obtain by law or pursuant to the terms of this Lease. This Section 4.2(a) shall survive the termination of this Lease with respect to any damage, bodily or personal injury, illness or death occurring prior to such termination.

Section 4.3. Commercial Liability Insurance. Tenant shall, at all times during the term of this Lease and at Tenant's sole cost and expense, obtain and keep in force commercial general liability insurance, including, but not limited to, contractual liability (specifically covering this Lease) and premises operations, all on an "occurrence" policy form, with a minimum per occurrence of $3,000,000 and an aggregate of not less than $5,000,000 for bodily or personal injury to, illness of, or death of persons and damage to property occurring in or on the Premises, such insurance shall name Landlord and any mortgagees designated by Landlord as additional insureds.

Section 4.4. Property Insurance. Tenant, at all times during the term of this Lease, at Tenant's sole cost and expense, naming Landlord as primary insured, shall obtain and keep in force insurance against loss or damage to the Premises by fire and all other risks of physical loss covered by insurance of the type now known as "all risk," with difference in conditions coverage, in an amount not less than the full replacement cost of the Premises (without deduction for depreciation), including the cost of debris removal and such endorsements as Landlord may reasonably require, and containing the "Replacement Cost Endorsement". At all times during the term of this Lease, Landlord shall maintain casualty and property damage insurance for the full replacement value of the Building and protecting against all perils included within the classification of fire, extended coverage, vandalism, malicious mischief, and "all risk" (except for risks associated with acts of terrorism).

Section 4.5. Policies. All insurance required to be maintained by Tenant under this Article 4 and all renewals thereof shall be issued by good and responsible companies qualified and admitted to do and doing business in the state where the Premises are located and having a rating in Best's Insurance Guide of at least A/XIII. Each policy to be maintained by Tenant shall expressly provide, to the extent commercially available, that the policy shall not be canceled or altered without thirty (30) days' prior written notice to Landlord. All insurance under this Article 4 to be maintained by Tenant shall name Landlord and any mortgagee designated by Landlord as an additional insured, shall be primary and noncontributing with any insurance which may be carried by Landlord, shall afford coverage for all claims based on any act, omission, event or condition that occurred or arose (or the onset of which occurred or arose) during the policy period, and shall expressly provide that Landlord, although named as an insured, shall nevertheless be entitled to recover under the policy for any loss, injury or damage to Landlord. Upon request by Landlord from time to time, Tenant shall deliver a certificate of insurance confirming that the coverages required hereunder are in full force and effect.

Section 4.6. Waiver of Subrogation. Tenant waives on behalf of all insurers under all policies of property, liability and other insurance (excluding workers' compensation) now or hereafter carried by Tenant insuring or covering the Premises, or any portion or any contents thereof, or any operations therein, all rights of subrogation which any insurer might otherwise, if at all, have to any claims of Tenant against Landlord. Tenant shall procure from each of the insurers under all policies of property, liability and other insurance (excluding workers'

compensation) now or hereafter carried by Tenant insuring or covering the Premises, or any portion or any contents thereof, or any operations therein, a waiver of all rights of subrogation which the insurer might otherwise, if at all, have to any claims of Tenant against Landlord as required by this Section 4.6.

## ARTICLE 5

## MAINTENANCE, ALTERATIONS AND OPERATIONS

Section 5.1.    Maintenance by Landlord. Except to the extent necessitated by the negligence or failure to act by Tenant, Landlord shall perform any and all maintenance and undertake such repairs as may be necessary in order to keep the sidewalks, elevator, roof, exterior (excluding glass of the Premises), structure, and utility connections to the Building in good order and repair, reasonable wear and tear excepted. In addition, Landlord shall be responsible for the replacement of any components of the electrical, plumbing, and heating, ventilation, and air conditioning systems serving the Premises which have either reached the end of their respective useful lives or cannot economically be repaired.

Section 5.2.    Maintenance by Tenant.  (a) Except to the extent necessitated by the negligence or failure to act by Landlord, Tenant shall perform any and all maintenance (including interior painting) and undertake all repairs as may be necessary in order to keep the interior, doors and interior glass, ceilings, and ceiling tiles in good order and repair, reasonable wear and tear excepted, including maintenance and repair of the electrical, plumbing, heating, ventilation, and air conditioning systems serving the Premises, the replacement of bulbs, fluorescent tubes, and ballasts, as necessary, and the proper storage and disposal of trash and other waste as provided for in Section 5.10.

(b) In furtherance of Tenant's maintenance responsibilities, Tenant, at its expense, shall do the following:

(i) Provide for and cause janitorial service to the Premises at the end of each school day (including replenishing of restroom supplies and, at reasonable intervals, window washing);

(ii) Not permit excessive noise amounting to a nuisance except for extraordinary circumstances such as fire drills;

(iii) Keep in full force and effect service contracts for the heating, ventilation, and air conditioning system serving the Premises and, upon request, furnish a copy of each such contract to Landlord; and

(iv) Keep the lobby and elevator serving the Premises reasonably neat and clean.

Section 5.3. Utilities.  Tenant, at its sole cost and expense, shall be responsible for the timely payment directly to service providers for all utility service provided to the Premises which

can be billed directly by such service provider to Tenant. Tenant, as a Common Area Charge, shall pay for any utilities serving the Premises which are billed on a Building-wide basis. For purposes of this Section 5.3, utility service shall include electricity, natural gas, water, sewer, telephone, and data/communication service. Landlord shall not be responsible for the interruption of or other failure in the provision of utility service caused by circumstances beyond Landlord's reasonable control. On or prior to the Lease Commencement Date, Tenant shall use best efforts (and Landlord shall cooperate with Tenant) to arrange for all utilities and other services to be provided on Tenant's account to the Premises.

Section 5.4. Tenant's Property. Following the completion of Tenant's Work, Tenant shall have the right to install in the Premises trade fixtures and other equipment and items of personal property reasonably necessary for carrying on the Permitted Use so long as such installation will not affect in any material way the structural, mechanical, electrical, plumbing or utility or life of any safety systems on the Premises. All such property shall be at the sole risk and hazard of Tenant, shall be deemed to remain movable property and shall be removed by Tenant at the expiration or sooner termination of this Lease at Tenant's sole cost and expense for removal and the repair of any damage to the Premises resulting from the installation and removal.

Section 5.5. Tenant's Improvements. Following the completion of Tenant's Work, Tenant shall not make any further leasehold improvements (which shall be deemed to refer to improvements in any form, whether or not the same affect the structure of the Premises, including alterations, partitions, additions and constructions), without first obtaining the consent of Landlord in writing thereto. Tenant shall be responsible at is sole expense for any and all permits and costs of compliance relating to any such improvements. Landlord shall not unreasonably withhold, condition or delay its consent. Unless Landlord notifies Tenant otherwise at the time Landlord approves such improvements, such leasehold improvements, whether or not severable, shall not be removed, but shall become the property of Landlord at the expiration or sooner expiration of this Lease, without compensation to Tenant. Tenant shall indemnify and hold Landlord harmless from and against any and all claims, demands, liabilities, damages, losses, costs and expenses, including reasonable attorneys' fees and disbursements, arising from or related to the construction or installation of any leasehold improvements made by Tenant's employees, agents or contractors.

Section 5.6. Removal Upon Termination or Expiration. At the expiration or sooner termination of this Lease, Tenant shall remove all of its goods and effects, together with all trade fixtures, equipment, and property, and peaceably yield up the Premises in as good order, repair, and condition as the same were at the Lease Commencement Date or had been put in thereafter, reasonable wear and tear excepted. Landlord, at Tenant's sole expense, may elect to remove, sell, discard, or store any such property left on the Premises and shall have no obligation to account to Tenant for any proceeds derived therefrom.

Section 5.7. Compliance with Law. (a) Tenant shall promptly observe and comply with all present and future laws, ordinances, requirements, orders, rules and regulations of federal, state, and local governments, with all requirements of any board of fire underwriters or similar body, and with all directives and certifications of occupancy insofar as any thereof are required

by the specific conduct, use or occupancy of the Premises by Tenant.  In addition, Tenant shall procure and maintain any licenses or permits required by the Permitted Use or for any equipment or materials located on the Premises.

(b) Tenant shall not injure or deface the Premises or permit on the Premises any nuisance or the emission therefrom of any objectionable noise or odor, nor use or permit any use of the Premises, nor take nor permit to be taken any action whatsoever, whether physical or otherwise, with respect to the Premises which is improper, offensive, harmful, or contrary to any regulation of any public authority, ordinance, or statute.

(c)  Tenant shall keep the Premises free from mechanics', materialmen's and all other liens arising out of any work performed, labor supplied, materials furnished or other obligations incurred by Tenant, whether in connection with Tenant's Work or at any other time. If any mechanic's, laborer's or materialmen's liens shall at any time be filed against the Premises or any part thereof (except those on account of Landlord's acts), Tenant, within sixty (60) days after notice of the filing thereof, shall cause the same to be discharged of record by payment, bonding or otherwise.  If Tenant shall fail to cause the same to be discharged, Landlord may, in addition to any other right or remedy, hereunder, immediately cause the same to be discharged, either by paying the amount claimed to be due or by bonding or otherwise, and all amounts so paid by Landlord, together with all costs and reasonable expenses incurred in connection therewith shall be paid by Tenant to Landlord, on demand, as additional rent hereunder.

(e) Landlord shall have the right to post and keep posted on the Premises any notices that may be provided by law or which Landlord may deem to be proper for the protection of Landlord and the Premises from such liens, and, following notice to Tenant, to take any other action Landlord reasonably deems necessary to remove or discharge liens or encumbrances at the expense of Tenant.  Tenant agrees to indemnity and hold Landlord harmless from and against any and all claims for mechanics', materialmen's or other liens in connection with any alterations, repairs, or any work performed, materials furnished or obligations incurred by or for Tenant.

Section 5.8. Landlord's Access. Landlord shall have the right to enter the Premises at any time during Tenant's hours of operations, accompanied by a Tenant representative, upon not less than forty-eight (48) hours notice, except in the case of an emergency, to (a) inspect the Premises, (b) exhibit the Premises to prospective purchasers or lenders, (c) perform any obligations of Tenant in accordance with Section 3.4, (d) post "For Sale" signs in and about the Premises, and (e) make any repairs to the Premises.  During the last nine (9) months of the Initial Term or Renewal Term, as applicable, upon not less than forty-eight (48) hours notice, Landlord may exhibit the Premises to prospective tenants and post "For Lease" signs in and about the Premises. Landlord shall at all times have a key to unlock all such doors and Landlord shall have the right to use any and all means which Landlord may deem proper to open such doors in an emergency to obtain entry to the Premises. Any entry to the Premises obtained by Landlord by any of such means shall not under any circumstances be construed or deemed to be a forcible or unlawful entry into or a detainer of the Premises or an eviction, actual or constructive, of Tenant from the Premises or any portion thereof.

Section 5.9. Signs. Tenant shall have the right to install, at Tenant's expense, exterior and interior signs and directories, subject to Landlord's prior approval (and any required governmental approval), and provided further that Tenant shall pay the cost of the repair and maintenance and utilities for the signs. At the expiration or sooner termination of this Lease, Tenant shall remove any signage and restore the Building to the same condition as at prior to the installation of the sign(s).

Section 5.10.  Waste Management. Tenant shall contract with the same trash and waste disposal company which is used by the tenant of the first floor of the Building for the disposal of trash and other waste from the Premises. Tenant shall store trash and other waste from the Premises in the area shown on Exhibit A in trash containers provided by Tenant.

## ARTICLE 6

## CASUALTY AND CONDEMNATION

Section 6.1. Casualty.  (a) If, during the Term, the Premises become substantially damaged or are totally destroyed, either party may elect to terminate this Lease by the giving, within thirty (30) days following the occurrence of such damage, of thirty (30) days' notice in writing to Tenant. For purposes of this Section 6.1, the term "substantially damaged" shall mean damage which is reasonably determined by Landlord's contractor to require more than one hundred twenty (120) days (assuming work will be performed during normal working hours) after the date of the casualty to complete and that the damage will prevent Tenant from continuing to operate Premises for the Permitted Use from at least twenty-five (25%) percent of the usable square footage of the Premises during that time. In the event of substantial damage or total destruction of the Premises, Landlord shall have no obligation to restore the Premises to their condition prior to the casualty.

(b) Subject to the provisions of Section 5.3(c), if neither party elects to terminate this Lease or in the event such destruction is not sufficient to permit termination hereunder, then Landlord, within a reasonable time, shall replace, restore or rebuild the destroyed portions thereof to substantially the same condition as existing immediately prior to said destruction, and if such restoration is not complete within one hundred fifty (150) days of the event of such damage, except for matters beyond the control of Landlord, Tenant shall be entitled to terminate this Lease at any time up to the time that such restoration is complete.  Landlord's obligation with respect to replacement, restoration and rebuilding shall not exceed the amount of insurance proceeds actually received by Landlord on account of the said casualty less the reasonable costs of the collection thereof and shall not include any property of Tenant or leasehold improvements effected by Tenant pursuant to Article 5 hereof.

(c) Notwithstanding the foregoing:

(i)     in the event such destruction occurs within one (1) year prior to the expiration of the Initial Term, Landlord shall have no obligation to replace, restore, or rebuild the destroyed portions of the Premises and this Lease shall expire on the expiration date of the Initial Term unless Tenant delivers the Exercise Notice within thirty (30) days following the occurrence

- 13 -

of such destruction in which event Landlord shall proceed to replace, restore, and rebuild the destroyed portions of the Premises in accordance with Section 6.1(b).

          (ii)     in the event such destruction occurs within one (1) year prior to the expiration of the Renewal Term, Landlord shall have no obligation to replace, restore, or rebuild the destroyed portions of the Premises and this Lease shall expire on the expiration date of the Renewal Term.

        (d) Until the Premises are restored by Landlord, there shall be an equitable abatement of Base Rent and Additional Rent.

        (e) Landlord reserves and excepts all rights, if any, to insurance proceeds or other compensation payable by reason of such destruction, and by way of confirmation Tenant hereby grants Landlord all Tenant's rights to such proceeds and other compensation and Tenant covenants to execute and deliver such further instruments of assignment thereof as Landlord from time to time may request.

        6.2.  <u>Condemnation</u>.  (a) If, during the Term, any part of the Premises shall be taken by any public or other authority by the exercise of any power of eminent domain or condemnation as to render the remainder of the Premises unsuitable for the Permitted Use, then this Lease shall terminate at the election of either Landlord or Tenant as of the date Tenant is required by the condemning authority to vacate the Premises or that portion of the Premises which is the subject of the condemnation proceedings.  In the event neither party elects to terminate, or in the event that such taking is not sufficient to entitle either party to terminate, a just proportion of the Base Rent and Proportionate Share according to the extent of the area of the Premises taken shall be abated for the remainder of the Term.  Any taking of land without structures thereon for the purpose of constructing or of increasing the width of any streets bordering the Premises shall not give either Landlord or Tenant the right to terminate the Lease under the provisions of this Section, nor Tenant the right to an abatement of rent hereunder.

        (b) Landlord reserves and excepts all rights and damages to the Premises and the leasehold hereby created, now accrued or hereafter accruing by reason of any such taking, and by way of confirmation Tenant hereby grants Landlord all Tenant's rights to such damages and covenants to execute and deliver such further instruments of assignment thereof as Landlord may from time to time request.  Landlord's reservation shall be without prejudice to any claim Tenant may have for moving expenses and Tenant's leasehold improvements.

        (c) Landlord and Tenant shall each give the other immediate notice in writing when either has prior notice thereof of any proposal for a taking by the exercise of eminent domain or otherwise of any portion of the Premises by public authority.

**ARTICLE 7**

**DEFAULT**

Section 7.1.  <u>Tenant's Event of Default</u>.  If Tenant shall:

- 14 -

(a) neglect or fail to perform or observe any term, covenant or condition by Tenant to be performed or observed hereunder, and such neglect or failure shall continue for more than ten (10) days after notice from Landlord that it is due (provided, however, that Landlord shall not be required to provide written notice to Tenant more than one (1) time in any twelve (12) month period) with respect to the covenant to pay rent or any other covenant calling for the payment of money by Tenant hereunder and more than twenty (20) days after written notice to Tenant with respect to any other term, covenant or condition (or such longer time, not to exceed forty-five (45) days, as is reasonably required to correct any alleged default); or

(b) file a petition under any bankruptcy, receivership, or other insolvency or creditors' rights law, or if such a petition is filed against Tenant under any such law and the same shall not be dismissed, vacated, stayed, or set aside within sixty (60) days from the date thereof,

then, and in any of said cases, Landlord may terminate this Lease by so notifying Tenant and Tenant covenants that, in case of such termination or in case of termination under the provisions of statute by reason of the default of Tenant, Landlord shall immediately be entitled to recover from Tenant, and Tenant shall forthwith pay Landlord any unpaid Base Rent, Additional Rent, or other payments called for hereunder accruing to such date, including, but not limited to, reasonable counsel fees, costs and expenses, incurred by Landlord in pursuit of its remedies hereunder and/or renting the Premises to others from time to time. In addition thereto, Tenant shall pay to Landlord in a lump sum and as damages for Tenant's breach of this Lease, an amount equal to the Base Rent and projected Additional Rent for the remainder of the Term, discounted to present value at the four (4) week Treasury Bill rate established at the next issuance following the termination of this Lease. In lieu of terminating this Lease on account of the default by Tenant, Landlord may elect to continue to enforce the provisions of this Lease in which event Tenant shall pay to Landlord an amount equal to the unpaid monthly Base Rent, Additional Rent, plus all other amounts payable by Tenant hereunder, including without limitation any and all reasonable costs and expenses relating to any reletting of the Premises, less an amount equal to any rent collected from any tenant or occupant of the Premises. Any subsequent lease of the Premises during a Tenant Event of Default will not relieve Tenant of its obligations under this Lease for the remainder of the Term.

Section 7.2. Landlord Default. Landlord shall in no event be in default in the performance of any of its obligations hereunder unless and until Landlord shall have failed to perform such obligations within thirty (30) days, or such additional time as is reasonably required to correct any such default (not to exceed sixty (60) days), after notice by Tenant to Landlord specifying wherein Landlord has failed to perform any such obligation. Notwithstanding the foregoing, if as a result of Landlord's failure to perform its obligations hereunder, Tenant is unable for at least ten (10) consecutive school days to operate its business in the Premises, the Base Rent and Additional Rent shall be reduced on a per diem basis in the proportion that the area of the Premises that is unusable bears to the total area of the Premises. Notwithstanding the foregoing, if such areas remain unusable for a period of thirty (30) consecutive school days and Tenant's business is materially and adversely affected thereby, Base Rent and Additional Rent shall abate during such period.

- 15 -

Section 7.3     Attorneys' Fees.  In the event of a Tenant Event of Default or a Landlord Event of Default, the non-defaulting party, as determined by a court of competent jurisdiction, shall be entitled to recover from the defaulting party the amount of any attorneys' fees reasonably incurred by the non-defaulting party in enforcing its rights and remedies hereunder.

## ARTICLE 8

## MISCELLANEOUS

Section 8.1.  Subletting and Assignment.  Tenant shall not assign this Lease, whether directly or indirectly, sublease all or any part of the Premises, permit any transfer thereof by operation of law, nor permit any use or occupancy of the same other than by Tenant without on each occasion obtaining the prior written consent of Landlord which Landlord shall not unreasonably withhold. Notwithstanding the aforesaid, Tenant shall have the right to assign this Lease to an affiliate or parent entity or in connection with a corporate merger, consolidation or the sale of substantially all of the assets of Tenant. No assignment of this Lease, sublease or transfer of the whole or any part of the Premises, nor the permitting of other use or occupancy of the same shall affect or reduce Tenant's continuing obligations under this Lease which shall remain in full force and effect for the remainder of the Term.

Section 8.2.  Lease Subordinate.  This Lease shall be subject and subordinate to any mortgage on the Premises or Building now of record or recorded after the date hereof and to each advance made or hereafter to be made under any mortgage, and to all renewals, modifications, consolidations, replacements and extensions thereof and all substitutions therefor, provided that such mortgagee shall agree to recognize this Lease and to not disturb Tenant's possession hereunder in the event of foreclosure. Tenant agrees to execute a subordination agreement provided the same includes a non-disturbance covenant in commercially reasonable form from any relevant mortgagee ("SNDA"). Landlord agrees to execute, and to obtain the agreement of any current mortgagee on a subordination agreement (also executed by Tenant) including a non-disturbance covenant in commercially reasonable form.  In the event any proceedings are brought for the foreclosure of, or the power of sale is exercised under, any such mortgage, provided Tenant and any such mortgagee are parties to an SNDA. Tenant shall attorn to the mortgagee or other purchaser upon any such sale and recognize such mortgagee or other purchaser as Landlord under this Lease.

Section 8.3.  Holding Over.  If Tenant shall hold possession of the Premises beyond the expiration or earlier termination of this Lease, Tenant shall pay to Landlord, for each month or portion thereof as Tenant shall retain such possession, 150% of the monthly Base Rent in effect at the expiration of the Lease and other charges specified herein, and shall be liable to Landlord for any and all lost rentals and other damages sustained by Landlord by virtue of such continued occupancy. In the absence of any express, written agreement between Landlord and Tenant, no act or failure to act by Landlord shall be deemed an acceptance of Tenant's occupancy for any fixed term (beyond the term fixed herein) in excess of one month.  Subject to the provisions of this Section 8.3, during any such holdover period, Tenant shall continue to be subject to all of the terms and conditions of this Lease. Nothing herein shall preclude Landlord from the exercise of any right or re-entry or other remedy under this Lease or under law.

Section 8.4.  Quiet Enjoyment.  Provided Tenant timely pays all rent and performs and observes all terms, conditions, and covenants of this Lease in all respects, Tenant shall peaceably and quietly hold, have, and enjoy the Premises as provided in this Lease, without hindrance or interruption from Landlord or anyone claiming by, through, or under Landlord.

Section 8.5.  Notices.  All notices relating to this Lease shall be in writing and delivered postage prepaid, by registered mail, return receipt requested, or by a nationally recognized, reputable overnight express delivery service, to the addresses of the respective parties first set forth above, or to such other address as either party may from time to time in writing direct the other party.

Section 8.6.  Remedies Cumulative.  Any and all rights and remedies which Landlord may have under this Lease and at law and equity shall be cumulative and shall not be deemed inconsistent with each other and any two or more of such rights and remedies may be exercised at the same time insofar as permitted by law.

Section 8.7.  Recording.  Under no event or upon any circumstances shall this Lease be recorded by Tenant.  Upon request of either party, the other party shall execute a memorandum summarizing the principal non-financial terms of this Lease for recording in the Land Evidence Records of the City of Providence. The cost of preparing and recording the memorandum shall be borne by the party requesting the memorandum.

Section 8.8.  Controlling Law.  This Lease shall be construed in accordance with and shall be governed by the laws of the State of Rhode Island without regard to its conflict of laws provisions. Any legal actions brought hereunder shall be brought in the state or federal courts in Providence, Rhode Island and the parties agree to the jurisdiction of said courts.

Section 8.9.  Severability.  In the event that any provision of this Lease shall be held by court of competent jurisdiction to be invalid or unenforceable, such holding, shall not affect the enforceability of the remainder of this Lease.

Section 8.10.  Waivers.  The failure of either party to insist in any one or more instances upon the strict and literal performance of any of the agreements, terms, or conditions of this Lease or to exercise any option herein contained, will not be construed as a waiver for the future of such term, condition, agreement or option.

Section 8.11.  Successors and Assigns. This Lease will bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  References made herein to the parties will be deemed to include their respective successors and permitted assigns.

Section 8.12.  Entire Agreement.  All negotiations, understandings and discussions between Landlord and Tenant concerning the Premises are incorporated within this Lease.  No statement, agreement, or understanding whether oral or written, not contained in this Lease shall be recognized or enforced.

Section 8.13.  Amendment.  This Lease shall not be modified except by writing executed by Landlord and Tenant.  No act or omission or any employee or agent of Landlord or Tenant shall alter, change, or modify any provision of this Lease.

Section 8.14.  Estoppel Certificates.  At any time and from time to time, Tenant shall, within ten (10) days after written request by Landlord, execute, acknowledge and deliver to Landlord a certificate certifying: (a) that this Lease is unmodified and in full force and effect (or, if there have been modifications, that this Lease is in full force and effect as modified, and stating the date and nature of each modification); (b) the Base Rent Commencement Date determined in accordance with Article 2 and the date, if any, to which all Base Rent, Additional Rent, and other sums payable hereunder have been paid; (c) that no notice has been received by Tenant of any default by Tenant hereunder which has not been cured, except as to defaults specified in such certificate; (d) that Landlord is not in default under this Lease, except as to defaults specified in such certificate; and (e) such other matters as may be reasonably requested by Landlord or any actual or prospective purchaser or mortgage lender. Any such certificate may be relied upon by Landlord and any actual or prospective purchaser or mortgage lender of the Premises or any part thereof. Tenant shall be responsible for any costs and reasonable counsel fees it incurs in complying with the requirements of this Section 8.14.

Section 8.15.  Broker.  Landlord and Tenant hereby warrant to each other that they have had no dealings with any real estate broker or agent in connection with the negotiation of this Lease except for Capstone Properties and Sweeney Real Estate & Appraisal, the payment of whose fees shall be the sole responsibility of Landlord. Except for the foregoing, Tenant and Landlord shall hold one another and their respective employees, agents and assigns, harmless from and against all claims, demands, actions and liabilities, expenses and other damages, including reasonable attorneys' fees, resulting from any claims asserted against Tenant or Landlord by any other broker, finder or other person with whom Tenant or Landlord has or purportedly has dealt.

Section 8.16.  Counterparts.  This Lease may be signed in any number of counterparts with all counterparts, together, constituting one original instrument.

(signature page to follow)

IN WITNESS WHEREOF, the parties have caused their authorized representatives to execute this Lease as of the date first above written.

LANDLORD:                                  179 Wayland Avenue, LLC

By: _____

Print Name: ___Stephen R. Lewinstein___

Title: _____Member_____

TENANT:                                    Oxford Street Education, LLC, d/b/a The Croft School

By: _____

Print Name: _____

Title: _____

**IN WITNESS WHEREOF**, the parties have caused their authorized representatives to execute this Lease as of the date first above written.

LANDLORD:                           179 Wayland Avenue, LLC


By:_____
Print Name:_____
Title:_____


TENANT:                             Oxford Street Education, LLC, d/b/a The Croft School


By:_____
Print Name: _Scott R. Given_
Title: _CEO, Oxford Street Education,
              DBA The Croft School_

Exhibit A

LEGEND

DEMOLITION KEYNOTES

REMOVE PORTION OF WALL

REMOVE DOOR

EXISTING WALL/MILLWORK/EQUIPMENT
TO BE DEMOLISHED

D1.0

DEMO PLAN

REVISIONS

179 WAYLAND STREET
PROVIDENCE

THE CROFT SCHOOL

EXHIBIT B



**New England Soundproofing**
40 Norfolk Ave.
Easton, MA 02375
(781) 710-1261
www.NewEnglandSoundproofing.com
www.REVRBacoustics.com

NEW ENGLAND SOUNDPROOFING

ESTIMATE NO.  15275
DATE  05/01/2018
SALES REP

| Bill To: | Ship To: |
|---|---|
| Boweman Associates | The Croft School |
| Colleen Titmas | 179 Wayland St |
| 1 Richard Sq. Suite 220E | Providence RI |
| Providence RI 02906 | 401-454-4300 |
| | C 401-265-6482 |

| ITEM | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| SoundBarrier HD | Sound Barrier HD: Thickness: 1/4". Weight: 2 lbs./sq. ft. Roll Size: 4.5' x 15'. SF per roll: 67.5. Sold Per Roll | 7,000 | 2.25 | 15,750.00 |
| Sound Barrier Tape | Sound Barrier tape: Length: 8', Width: 3", Thickness: 1/16" Material: Sound Barrier MLV This is to tape and seal all seams and perimeters to make it as air tight as possible | 400 | 6.50 | 2,600.00 |
| Green Glue Acoustic Sealant | Green Glue Acoustic Sealant: 28oz per tube. Approx 50LF per tube. Used to seal small joints and gaps. Caulk and seal all the wall perimiters | 50 | 11.95 | 597.50 |
| ECOsilent 5MM | ECOsilent resilient floor underlayment: Roll Size: 4' x 30'. Thickness: 5MM or 1/4". Coverage: 120SF. Price Per Roll This is for the strips to be installed under the partition between the wall bottom plate and flooring. | 2 | 168.00 | 336.00 |
| 6000 - Labor | Labor to install the above soundproofing materials We will deliver the Sound Barrier HD, install it over the existing plywood and concrete sub floor, tape and seal all joints and perimeters as needed. The rooms will need to be fully empty. Remove and dispose any debris caused by us. We will clean the area in a broom swept. | 7,000 | 2.20 | 15,400.00 |
| | | | Subtotal: | 34,683.50 |
| Discount | | 35,033.50 | -0.05 | -1,751.68 |

Note:
I calculated to cover the complete floor including over the cement floor. the reason is if you only do over the plywood floor then it will have two different hight and it will also help prevent joint transfer/crack to the finished flooring.

Final measurements to be verified on site. We will make any price adjustments as needed.

Let me know if you're tax exempt and I will deduct the sales tax

SUBTOTAL

TAX

$32,931.82

TOTAL

Sign Here To Accept Order: _____    Date: _____

ANY QUESTION, PLEASE CONTACT YOUR SALES REPRESENTITIVE AT (781) 710-1261

All returns of products are subjected to a 20% restocking fee. All returns must be in full and original package. No opened package can be returned. REVRB Acoustic, Magnetite, Glass, Door Kits, And Any Custom Cut Products Cannot Be Returned.

Page 1 of 1

EXHIBIT B



## THE CROFT SCHOOL

October 25, 2020

Dear Mr. Lewenstein and Mr. Bates,

Oxford Street Education LLC (dba The Croft School) exercises its option to extend our existing lease at 179 Wayland Avenue, 2nd Floor, Providence, RI, by three additional years, as written in the original lease document.

Sincerely,

Scott Given
Founder and CEO, Oxford Street Education

179 Wayland Avenue, 2nd Floor, Providence, RI 02906                    www.thecroftschool.org

## FIRST AMENDMENT TO LEASE

**THIS FIRST AMENDMENT TO LEASE** is entered into as of the 28th day of November, 2023, by and between **179 WAYLAND AVENUE, LLC**, a Rhode Island limited liability company ("Landlord"), and **OXFORD STREET EDUCATION, LLC**, a Delaware limited lability company, d/b/a The Croft School ("Tenant").

**WHEREAS**, Landlord and Tenant are parties to that certain Lease Agreement dated as of May 9, 2018 with respect to rentable space on the second floor of the building located at 179 Wayland Avenue, Providence, Rhode Island (the "Premises"); and

**WHEREAS**, the parties have agreed to modify certain provisions of the Lease and desire to memorialize their agreement in the form of this First Amendment to Lease; and

**WHEREAS**, capitalized terms not defined herein shall have the meanings given to them in the Lease,

**NOW, THEREFORE**, the parties agree as follows:

1.      Term. Section 3.1 of the Lease and the reference to "Initial Term" in Article 1 of the Lease are hereby amended to provide that the words "Initial Term" and "Term" mean the period of time from the Lease Commencement Date through and including August 31, 2031.

2.      Option to Renew. Section 3.2 of the Lease and the reference to "Option to Renew" in Article 1 of the Lease are deleted in their entirety.

3.      Base Rent. The Base Rent chart in Article 1 of the Lease is hereby deleted in its entirety and the following is hereby substituted therefor:

| From | To | Annually | Monthly | Per Sq Ft |
|------|-----|----------|---------|-----------|
| September 1, 2023 | August 31, 2024 | $177,600.00 | $14,800.00 | $24.00 |
| September 1, 2024 | August 31, 2025 | $184,704.00 | $15,392.00 | $24.96 |
| September 1, 2025 | August 31, 2026 | $192,104.00 | $16,008.67 | $25.96 |
| September 1, 2026 | August 31, 2027 | $199,800.00 | $16,650.00 | $27.00 |
| September 1, 2027 | August 31, 2028 | $207,866.00 | $17,322.17 | $28.09 |
| September 1, 2028 | August 31, 2029 | $216,080.00 | $18,006.67 | $29.20 |
| September 1, 2029 | August 31, 2030 | $224,738.00 | $18,728.17 | $30.37 |
| September 1, 2030 | August 31, 2031 | $233,692.00 | $19,474.33 | $31.58 |

4.      Security Deposit.. Section 1.1 of the Lease is hereby amended to delete the existing provision therein regarding the Security Deposit and by substituting the following therefor:

-1-

"The Security Deposit being held by Landlord pursuant to the terms of the Lease is $59,200.00, consisting of $29,600.00 delivered by Tenant upon execution of this First Amendment and $29,600.00 already being held by Landlord. Provided no Event of Default exists on the Date of Reduction, as follows, Landlord shall reduce the amount of the Security Deposit as follows:

| Date of Reduction | Amount of Reduction |
| --- | --- |
| August 31, 2026 | $29,600.00 |

At Landlord's option, upon written notice to Tenant, Landlord shall either pay the Amount of Reduction to Tenant on the Date of Reduction or Landlord shall credit the Amount of Reduction to subsequent payments of monthly Base Rent falling due under this Lease."

5.      Additional Rent on Account of Building Expenses. Section 3.8(a) of the Lease is amended to add the following as a new last sentence:

"In addition, Tenant, as Additional Rent, shall be responsible to pay to Landlord one hundred (100%) percent of the direct expenses incurred by Landlord exclusively in connection with Tenant's occupancy of the Premises, including, without limitation, all expenses associated with the operation and maintenance of the elevator serving the Premises and the telephone located inside the elevator cab."

6.      Modification. This First Amendment may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, agreement or discharge is sought.

7.      Binding Effect and Counterparts. This First Amendment shall be binding upon and inure to the benefit of the parties hereto and their permitted successors and assigns. The signatory of this document on behalf of each party represents that he/she is a duly appointed officer or representative of such party and is duly authorized to execute this document on its behalf. This First Amendment may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument. Electronic copies of executed counterparts of this First Amendment shall be considered originals thereof.

8.      Confirmation of Lease Terms; Estoppel and Release. Except as modified by this First Amendment, the Lease and all the terms and provisions thereof are hereby in all respects ratified, confirmed and approved. Tenant hereby affirms that on the date hereof no breach or uncured default by Landlord has occurred with respect to the Lease and that the Lease is in full force and effect with no defenses or offsets thereto. Tenant hereby releases Landlord of and from all liabilities, claims, controversies, causes of action and other matters of every nature which, through the date hereof, have or might have arisen out of or in any way in connection with the Lease and/or the Premises.

9.      Entire Agreement. This First Amendment contains the entire understanding between the parties with respect to the matter contained herein. No representations, warranties, covenants or agreements have been made concerning or affecting the subject matter of this First Amendment, except as are contained herein.

10.      No Offer.  The submission of this First Amendment to Tenant shall not be construed as an offer, nor shall Tenant have any rights with respect hereto, unless and until Landlord shall execute a copy of this First Amendment and unconditionally deliver the same to Tenant.

(signature page follows)

**IN WITNESS WHEREOF**, the undersigned have caused their authorized representatives to execute this First Amendment as of the date first above written.

LANDLORD:                           179 Wayland Avenue, LLC

By: _____     12/4/23
Print Name: RONALD  BATES
Title: MEMBER

TENANT:                             Oxford Street Education, LLC, d/b/a The Croft School

By: _____     12/4/23
Print Name: Scott R. Given
Title: Founder and CEO